# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE:  ACTIQ SALES AND MARKETING
PRACTICES LITIGATION

No. 07-cv-4492 (PBT)

## MEMORANDUM IN SUPPORT OF
## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

# CONFIDENTIAL

**UNREDACTED VERSION
FILED UNDER SEAL PURSUANT TO TERMS OF
AMENDED STIPULATION AND PROTECTIVE ORDER (Dkt. # 293)**

001936-11  451929 V3

## TABLE OF CONTENTS

**Page(s)**

I.   INTRODUCTION ................................................................................................1

II.  STATEMENT OF FACTS ...................................................................................5

    A.   Common Evidence Demonstrates That Cephalon Was Unjustly Enriched
        through Its Nationwide Scheme to Sell Actiq for the Treatment of
        Non-Cancer Pain ........................................................................................5

        1.   The FDA approved Actiq for breakthrough cancer pain in cancer
            patients and required Cephalon to monitor and actively discourage
            non-cancer prescriptions. ..............................................................6

        2.   Cephalon intentionally marketed Actiq for non-cancer pain to increase
            sales, conveying the message that "pain is pain." ...........................8

        3.   Cephalon buried an internal auditor's attempt to blow the whistle on
            Cephalon's intentional non-compliance with the Actiq risk
            management program ......................................................................9

        4.   Cephalon launched Actiq ▮▮▮▮▮▮▮▮▮▮ of managed care
            and worked to ensure that the Class would pay for non-cancer Actiq
            prescriptions. ...............................................................................10

    B.   Dr. Deborah B. Leiderman Opines That the FDA Intended That Actiq Sales
        Remain Within the Cancer Population ...................................................11

    C.   Dr. Meredith Rosenthal Used Standard Methodologies and Data from
        Cephalon to Calculate Class Damages on a Class-Wide Basis .............13

III.  PLAINTIFFS SATISFY THE REQUIREMENTS OF RULE 23 .....................14

    A.   Plaintiffs Satisfy the Four Requirements of Rule 23(a) ..........................15

        1.   Plaintiffs satisfy Rule 23(a)(1)'s numerosity requirement because
            there are more than 1,000 TPP Class members. ..........................15

        2.   Unjust enrichment claims present common questions of law or fact
            as required by Rule 23(a)(2). ......................................................16

        3.   Plaintiffs' claims are typical of those of the Class under Rule 23(a)(3)
            given Cephalon's deceptive conduct and refusal to halt off-label sales. ...17

        4.   ICWF and PTC will fairly and adequately protect the interests of the
            Classes pursuant to Rule 23(a)(4). .............................................18

001936-11 451929 V3

B.  Rule 23(b)(3) is Satisfied Because Common Questions of Law or Fact Predominate and a Class Action Remains Superior over Other Forms of Adjudication.................................................................................................19

1.  Common questions of law predominate because there are minimal actual differences among each state's unjust enrichment law. .................19

    a.  Common questions of law predominate for the Nationwide Class because only one state's law will need to be applied...........20

        (1)  The law of the case directs that Pennsylvania law should apply to Plaintiffs' unjust enrichment claims.........20

        (2)  Even if Cephalon improperly relitigated the choice of law issue, RESTATEMENT (SECOND) OF CONFLICTS § 145 unequivocally points to the application of Pennsylvania law. .............................................................22

        (3)  Because nationwide application of Pennsylvania unjust enrichment law properly governs here, common questions of law predominate. ...........................................24

    b.  Common questions of law predominate for the alternative classes. ..................................................................................24

2.  Given the ample common evidence of Cephalon's misconduct set forth in the Proffer of Facts, common questions of fact predominate. .......31

    a.  Common questions of fact predominate for the Nationwide Class................................................................................31

    b.  Common questions of fact predominate for the Alternative Classes...............................................................................36

    c.  Damages can be calculated – and have been calculated – on a class-wide basis.................................................................37

3.  Plaintiffs submit a proposed trial plan demonstrating common questions of fact and law predominate and that a class action is manageable. ..............................................................................38

4.  A class action is a superior method for fairly and efficiently adjudicating this controversy. ...................................................39

C.  Plaintiffs' Counsel are Adequate Class Counsel under Rule 23(g) ......................40

IV.  CONCLUSION.............................................................................................41

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Allapattah Servs. v. Exxon Corp.,*
188 F.R.D. 667 (S.D. Fla. 1999) .......................................................................................25

*Amchem Prods. v. Windsor,*
521 U.S. 591 (1997) ...............................................................................................19, 39

*Baby Neal for & by Kanter v. Casey,*
43 F.3d 48 (3d Cir. 1994) .................................................................................................16

*Carroll v. Stettler,*
2011 U.S. Dist. LEXIS 121171 (E.D. Pa. Oct. 19, 2011) ............................... *passim*

*Chakejian v. Equifax Info. Servs. LLC,*
256 F.R.D. 492 (E.D. Pa. 2009) .......................................................................................16

*Cipolla v. Shaposka,*
439 Pa. 563, 267 A.2d 854 (1970) ....................................................................................22

*Dal Ponte v. American Mortg. Express Corp.,*
2006 U.S. Dist. LEXIS 57675 (D.N.H. Aug. 17, 2006) ..........................................36

*Georgine v. Amchem Prods., Inc.,*
83 F.3d 610 (3d Cir. 1996) ...............................................................................................39

*Gwiazdowski v. County of Chester,*
263 F.R.D. 178 (E.D. Pa. 2009) .......................................................................................17

*Hanlon v. Chrysler Corp.,*
150 F.3d 1011 (9th Cir. 1998) .........................................................................................25

*Hayes v. Wal-Mart,*
281 F.R.D. 203 (D.N.J. 2012) ...........................................................................4, 32, 36

*In re Abbott Labs. Norvir Anti-Trust Litig.,*
2007 WL 1689899 (N.D. Cal. June 11, 2007) ..........................................................27

*In re Actiq Sales & Marketing Practices Litig.,*
2012 U.S. Dist. LEXIS 81773 (E.D. Pa. June 13, 2012) .......................................20

*In re Actiq Sales & Mktg. Practices Litig.,*
790 F. Supp. 2d 313 (E.D. Pa. 2011) ....................................................................... *passim*

001936-11 451929 V3

*In re Checking Account Overdraft Litig.,*
    2012 U.S. Dist. LEXIS 113621 (S.D. Fla. Aug. 10, 2012) ..................................... 19

*In re Chiang,*
    385 F.3d 256 (3d Cir. 2004) ................................................................................... 38

*In re Copley Pharm., Inc.,*
    161 F.R.D. 456 (D. Wyo. 1995) ............................................................................... 25

*In re Flat Glass Antitrust Litig.,*
    191 F.R.D. 472 (W.D. Pa. 1999) ........................................................................ 16, 18

*In re Flonase Antitrust Litig.,*
    2012 U.S. Dist. LEXIS 83950 (E.D. Pa. June 18, 2012) ........................................... 4

*In re Hydrogen Peroxide Antitrust Litig.,*
    552 F.3d 305 (3d Cir. 2008) ................................................................................... 37

*In re Insurance Brokerage Antitrust Litig.,*
    282 F.R.D. 92 (D.N.J. 2012) ................................................................................... 40

*In re Mercedes-Benz Tele Aid Contract Litig.,*
    257 F.R.D. 46 (D.N.J. 2009) ................................................................................... 21

*In re Neurontin Mktg. & Sales Practices Litig.,*
    257 F.R.D. 315 (D. Mass. 2009) ............................................................... 33, 34, 35

*In re OSB Antitrust Litig.,*
    2007 U.S. Dist. LEXIS 56584 (E.D. Pa. Aug. 3, 2007) ........................................... 18

*In re Pennsylvania Baycol Third-Party Payor Litig.,*
    2005 Phila. Ct. Com. Pl. LEXIS 129 (Pa. C.P. 2005) ................................... *passim*

*In re Pharm. Indus. Average Wholesale Price Litig.,*
    252 F.R.D. 83 (D. Mass. 2008) ............................................................................... 25

*In re Prudential Ins. Co. of Am. Sales Practices Litig. Agent Actions,*
    148 F.3d 283 (3d Cir. 1998) ................................................................................... 26

*In re Telectronics Pacing Sys., Inc.,*
    172 F.R.D. 271 (S.D. Ohio 1997) ........................................................................... 25

*In re Terazosin Hydrochloride Antitrust Litig.,*
    220 F.R.D. 672 (S.D. Fla. 2004) ............................................................................. 27

*In re Warfarin Sodium Antitrust Litig.,*
    212 F.R.D. 231 (D. Del. 2002), *aff'd*, 391 F.3d 516 (3d Cir. 2004) ....................... 25

001936-11 451929 V3

*In re Zyprexa Prods. Liab. Litig.*,
    253 F.R.D. 69 (E.D.N.Y. 2008) ........................................................................... 35

*In re Zyprexa Prods. Liab. Litig.*,
    620 F.3d 121 (2d Cir. 2010) ................................................................ 33, 34, 35

*Johnston v. HBO Film Mgmt., Inc.*,
    265 F.3d 178 (3d Cir. 2001) ..................................................................... 16, 18

*Keilholtz v. Lennox Hearth Prods.*,
    268 F.R.D. 330 (N.D. Cal. 2010) .................................................................... 27

*Klaxon Co. v. Stentor Elec. Mfg. Co.*,
    313 U.S. 487 (1941) ........................................................................................ 20

*McCall v. Drive Fin. Servs., L.P.*,
    236 F.R.D. 246 (E.D. Pa. 2006) ..................................................................... 19

*Miletak v. Allstate Ins. Co.*,
    2010 U.S. Dist. LEXIS 26913 (N.D. Cal. Mar. 5, 2010) ............................... 37

*O'Brien v. Brain Research Labs, LLC*,
    2012 U.S. Dist. LEXIS 113809 (D.N.J. Aug. 8, 2012) ............................ 4, 16, 39

*O'Keefe v. Mercedes-Benz USA, LLC*,
    214 F.R.D. 266 (E.D. Pa. 2003) ..................................................................... 26

*Overka v. American Airlines, Inc.*,
    265 F.R.D. 14 (D. Mass. 2010) ...................................................................... 26

*Powers v. Lycoming Engines*,
    245 F.R.D. 226 (E.D. Pa. 2007), *vacated on other grounds*,
    2009 U.S. App. LEXIS 6785 (3d Cir. 2009) .................................................. 21

*Ratti v. Wheeling Pittsburgh Steel Corp.*,
    2000 PA Super 239, 758 A.2d 695 (Pa. Super. 2000) .................................... 20

*Slapikas v. First Am. Title Ins. Co.*,
    250 F.R.D. 232 (W.D. Pa. 2008) .................................................................... 36

*Southern States Police Benevolent Ass'n v. First Choice Armor & Equip., Inc.*,
    241 F.R.D. 85 (D. Mass. 2007) ...................................................................... 25

*Stewart v. Abraham*,
    275 F.3d 220 (3d Cir. 2001) ........................................................................... 16

*Sullivan v. DB Invs., Inc.*,
    667 F.3d 273 (3d Cir. 2012), *cert. denied*, 132 S. Ct. 1876 (2012) ............... *passim*

001936-11 451929 V3

*Waldorf v. Shuta,*
    142 F.3d 601 (3d Cir. 1998)................................................................................................20

*Waste Mgmt. Holdings, Inc. v. Mowbray,*
    208 F.3d 288 (1st Cir. 2000)..............................................................................................25

## OTHER AUTHORITIES

NEWBERG ON CLASS ACTIONS § 18:5 (4th ed. 2002) .................................................................16

## I.   INTRODUCTION

"Pain is pain," Cephalon repeatedly – in 2002, 2003, 2004, 2005, and 2006 – told its sales representatives and paid consultants, who in turn repeated the mantra thousands of times to physicians to encourage prescriptions of Actiq for all types of pain.  Cephalon's marketing push worked:  Actiq sales increased from $15 million in the cancer pain market in 2000 to $477 million in the general pain market by 2006, the majority of which was paid by the third-party payor ("TPP") Plaintiffs and class members.

What Cephalon *never* trained its sales representatives to emphasize – and thus avoided telling physicians during the Class Period – was that Actiq, a Schedule II opioid 200 times more potent than oxycodone, was so addictive and risky that it should "**ONLY** [be prescribed] for the management of breakthrough cancer pain in patients with malignancies who are already receiving and who are tolerant to opioid therapy for their underlying cancer pain."[1]  Proffer of Facts In Support of Plaintiffs' Motion For Class Certification ("Proffer"), ¶ 19 (emphasis in original document published by the United States Food and Drug Administration ("FDA")).  Cephalon knew if it told the truth, *i.e.*, that Actiq was contraindicated for acute or post-operative pain and should never be used outside its approved indication; its sales would max out at the $15 million cancer pain market share achieved in 2000.  So Cephalon purposefully devised a marketing plan to stay ▮▮▮▮▮▮▮▮▮▮▮ of Plaintiffs and the managed care class members and to invade the physician-patient relationship to push Actiq, like a common drug dealer, for acute and post-operative pain, including for ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

---

[1] "Breakthrough cancer pain" may be referred to as "BTCP" or "cancer pain" unless otherwise noted.  "Patients with malignancies who are already receiving and who are tolerant to opioid therapy for their underlying cancer pain" will be referred to as "cancer patients."

While Cephalon will claim that the communications with doctors, patients and sales representatives create individual issues that defeat class certification (because those conversations purposefully occurred behind closed doors), Cephalon will ignore one unique and critical fact that predominates over all others.  Cephalon agreed with the FDA, as a precondition to selling Actiq, that it would monitor off-label prescribing and, under certain circumstances,[2] implement a proactive marketing campaign ***to stop physicians from prescribing Actiq for anything other than breakthrough cancer pain in cancer patients***.  Cephalon admits that it did not implement any campaign to halt the meteoric rise in off-label prescriptions of Actiq – but nonetheless willingly accepted the benefits of the payments made by Plaintiffs and the Class for those off-label prescriptions.  Thus, because Cephalon had the power and duty to stop the sales at issue here, but chose not to, Cephalon cannot defeat class certification and Cephalon's liability should be presented to the trier of fact on a class-wide basis.

Pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), Plaintiffs seek class certification of a Nationwide Class under Pennsylvania unjust enrichment law:

### NATIONWIDE CLASS

All Third-Party Payors ("TPP")[3] in the United States who paid and/or reimbursed, in whole or in part, for the cost of Actiq

---

[2] *See* Proffer §§ II.B.3, II.D for a discussion of the circumstances that should have triggered Cephalon's obligation to educate physicians to stop prescribing Actiq for non-cancer pain. These triggering circumstances were common to all Class members, do not implicate any individual Class member, focus solely on Cephalon's actions, and should be submitted to the trier of fact.

[3] For any class, "Third-Party Payor" ("TPP") means a private or governmental entity that was or is at risk to pay all or part of the cost of Actiq, which was prescribed, provided or administered in the United States for individual members, employees, plan participants, beneficiaries or insureds of the TPP's prescription drug or health coverage.  TPP shall not include:  (1) Defendant, any entity in which Defendant has a controlling interest, and Defendant's legal representatives, predecessors, successors, assigns, and employees; (2) the U.S. Government and its agencies and departments, and all other governmental entities that made payments pursuant to any state's Medicaid program; (3) all federal, state or local governmental entities, except for such governmental agencies or programs that made or incurred an obligation to make a reimbursement for Actiq as part of a health benefit plan for their employees, but only

prescribed for indications other than cancer and for consumption
by their members, employees, plan participants, beneficiaries or
insureds during the period from January 1, 2002 through
December 31, 2006.

Alternatively, Plaintiffs request certification of two classes of third-party payors, grouped by

states with similar state unjust enrichment laws:

*ALTERNATIVE CLASSES*

**"Unjust Enrichment (Restatement) Class"**:  All Third-Party
Payors ("TPP") in the United States who paid and/or reimbursed,
in whole or in part, in Arkansas, Colorado, Connecticut, the
District of Columbia, Hawaii, Illinois, Indiana, Iowa, New
Hampshire, New York, Oklahoma and West Virginia, for the cost
of Actiq prescribed for indications other than cancer and for
consumption by their members, employees, plan participants,
beneficiaries or insureds during the period from January 1, 2002
through December 31, 2006.

**"Unjust Enrichment (Appreciation) Class"**:  All Third-Party
Payors ("TPP") in the United States who paid and/or reimbursed,
in whole or in part, in Alaska, California, Florida, Georgia, Kansas,
Kentucky, Maine, Maryland, Massachusetts, Missouri, Nevada,
New Mexico, Pennsylvania, Rhode Island, South Carolina, South
Dakota, Tennessee, Utah, Vermont, Washington and Wisconsin,
for the cost of Actiq prescribed for indications other than cancer
and for consumption by their members, employees, plan
participants, beneficiaries or insureds during the period from
January 1, 2002 through December 31, 2006.

Because Plaintiffs satisfy Rule 23 by a preponderance of the evidence, the Nationwide Class or

the Alternative Classes should be certified.[4]

First, Plaintiffs satisfy the requirements of Rule 23(a).  The Classes are comprised of

hundreds of third-party payors in the U.S. that paid for thousands of Actiq prescriptions for non-

cancer pain in satisfaction of Rule 23(a).  Moreover, there are numerous common questions of

---

with respect to such payments; (4) the Court and any judge assigned to this case; and (5) class
counsel.

[4] Or, single state classes should be certified under the laws of Indiana and Pennsylvania,
where the Plaintiffs reside.

fact or law, particularly given that Plaintiffs seek certification solely under unjust enrichment laws. Next, Plaintiffs are typical because they paid for Actiq and seek disgorgement of Cephalon's profits on the sale of Actiq for non-cancer pain, which is relief common to the Class. Finally, Plaintiffs will adequately protect the interests of the Class because they do not have any conflicts with the Class and are represented by highly-qualified counsel experienced in pharmaceutical class action litigation.

Plaintiffs also satisfy the requirements of Rule 23(b)(3). Common questions of law or fact predominate over any questions affecting only individual members. This Court has already recognized that "there are minimal actual differences between the unjust enrichment laws in each of the 50 states." *In re Actiq Sales & Mktg. Practices Litig.*, 790 F. Supp. 2d 313, 322 (E.D. Pa. Mar. 23, 2011). Cephalon also "acknowledges that 'there are no ascertainable relevant differences between the unjust enrichment law of Pennsylvania and that of Indiana.'" *Id.* at 329 n.15 (quoting Def. Mot. Summ. J. 11 n.3). In fact, multiple courts within the Third Circuit have certified classes under unjust enrichment law within the last year.[5] Further, as demonstrated in the extensive Proffer of Facts accompanying this motion, the focus of this case – and the trial – will be on Defendant's conduct and not on any individual Class member.

Finally, a class action is superior to hundreds of individual trials on behalf of third-party payors. All of the facts – except for the amount of payment by each TPP – that would be presented at trial are the same for each Class member, and thus a single trial will achieve

---

[5] *See, e.g.*, *O'Brien v. Brain Research Labs, LLC*, 2012 U.S. Dist. LEXIS 113809, at *1 (D.N.J. Aug. 8, 2012) (finding Rule 23(a) and (b)(3) satisfied for unjust enrichment claims and granting final approval to class action settlement); *Hayes v. Wal-Mart*, 281 F.R.D. 203 (D.N.J. 2012) (certifying Rule 23(b)(3) action involving unjust enrichment claims); *Carroll v. Stettler*, 2011 U.S. Dist. LEXIS 121171, at *1 (E.D. Pa. Oct. 19, 2011) (certifying Rule 23(b)(3) class action including unjust enrichment claims). *See also In re Flonase Antitrust Litig.*, 2012 U.S. Dist. LEXIS 83950, at *1 (E.D. Pa. June 18, 2012) (certifying Rule 23(b)(3) class action involving unjust enrichment claims in action brought by third-party payors against defendant drug manufacturer).

economies of time, effort and expense.  Moreover, as set forth in the accompanying trial plan, a single trial is manageable on behalf of the Classes.  Accordingly, because Plaintiffs satisfy Rule 23(a) and (b)(3), Plaintiffs' Motion for Class Certification should be granted.

## II.     STATEMENT OF FACTS

With their motion, Plaintiffs file their Proffer of Facts, the Declaration of Deborah B. Leiderman, M.D., M.A. ("Leiderman Decl."); and the Declaration of Meredith Rosenthal ("Rosenthal Decl.").  Together, the Proffer and the Reports demonstrate that the Class' unjust enrichment claim "can be proved through evidence common to the class rather than individual to its members." *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 306 (3d Cir. 2012), *cert. denied*, 132 S. Ct. 1876 (2012) (citation and quotation omitted).  Indeed, the Proffer confirms that, other than the fact of purchase, all of the facts that Plaintiffs will use to prove their claims on a class-wide basis are common and available from Defendant's own files or from other publicly-available sources.  Short summaries of each follow.

## A.     Common Evidence Demonstrates That Cephalon Was Unjustly Enriched through Its Nationwide Scheme to Sell Actiq for the Treatment of Non-Cancer Pain

First, the Proffer of Facts details the common evidence that Plaintiffs will use to prove at trial that Cephalon implemented a nationwide scheme from its home office in Pennsylvania to market and sell Actiq for non-cancer pain.  Common evidence also exists to demonstrate that Cephalon purposefully ignored the FDA's requirement to implement a medical education program to actively discourage doctors from prescribing Actiq for non-cancer pain.  The common evidence set forth in the Proffer is outlined below.

001936-11 451929 V3

1.      **The FDA approved Actiq for breakthrough cancer pain in cancer patients
and required Cephalon to monitor and actively discourage non-cancer
prescriptions.**

Actiq is the name brand for fentanyl delivered in the form of a lollipop and is a

Schedule II opioid with serious risks for addiction and safety.  Proffer, §§ II.B, II.D.  The

November 4, 1998, FDA approval letter explains that Actiq is only appropriate to treat

breakthrough cancer pain in cancer patients:

> We have concluded that adequate information has now been
> presented to demonstrate that Actiq is safe and effective, when
> marketed in accordance with the terms of restricted distribution
> and use described in the Risk Management Program … and as
> recommended in the final labeling....  In addition, please note that
> this product has been approved **ONLY** for the management of
> breakthrough cancer pain ["BTCP"] in patients with malignancies
> who are already receiving and who are tolerant to opioid therapy
> for their underlying persistent cancer pain.

*Id.* ¶ 19.  Because of the serious risk for addiction and overdose:

> *Actiq* **is indicated only for the management of breakthrough
> cancer pain in patients with malignancies who are** <u>already
> receiving and who are tolerant to opioid therapy for their
> underlying persistent cancer pain.</u>

*Id.* ¶ 22.  Moreover, it is expressly "contraindicated"[6] by the FDA for acute or post-operative

pain:

> Because life-threatening hypoventilation could occur at any dose in
> patients not taking chronic opiates, *Actiq* is contraindicated in the

---

[6] "Contraindicate" is defined as "to report the presence of a disease or physical condition that
makes it impossible or undesirable to treat a particular client in the usual manner or to prescribe
medicines that might otherwise be suitable."  Mosby's Medical Dictionary (8th ed. 2009),
*available at* http://medical-dictionary.thefreedictionary.com/contraindicate (last visited
October 11, 2012).  *See also* Mosby's Medical Dictionary (8th ed. 2009), *available at*
http://medical-dictionary.thefreedictionary.com/contraindication (last visited October 11, 2012)
("contraindication" is "a factor that prohibits the administration of a drug or the performance of
an act or procedure in the care of a specific patient.  For example, pregnancy is a
contraindication for the administration of tetracycline, immunosuppression may be a
contraindication for vaccination, and complete placenta previa is a contraindication for vaginal
delivery.").

management of acute or postoperative pain.  This product **must not** be used in opioid non-tolerant patients.

*Id.* ¶ 22, 23 (emphasis in original).  As an integral part of the FDA's approval of Actiq, the FDA required Cephalon to abide by the Actiq Risk Management Program ("RMP"), an extensive program of post-marketing surveillance and reporting mechanisms, requiring Cephalon's direct intervention with off-label prescribing by both individuals and physician groups.  *Id.* ¶¶ 24-27.  Among other requirements, the RMP obligated Cephalon to actively discourage non-cancer uses of Actiq, for both individual physicians and groups of physicians.  *Id.*  Indeed, if off-label prescriptions *potentially* reached significant percentages, the FDA required Cephalon to act – *nationally* – in order to ensure that Actiq remained used by the narrow patient population:

> If groups of physicians (such as a particular specialty) are identified as having prescribed *Actiq* inappropriately, and these prescriptions represent ***potential*** off-label usage greater than 15% of total quarterly Actiq prescriptions, [Cephalon] will contact the appropriate professional society (i.e. American College of Surgeons, American Society of Anesthesiologists).  This letter will outline prescribing concerns and offer to implement an educational program in conjunction with the professional society ***in a national setting***.

*Id.* ¶ 27 (emphasis added).  Similarly, if "a problem of off-label usage becomes known and individual prescribers are identified," the RMP obligated Cephalon to individually notify "all identified prescribers to emphasize the approved indication and appropriate patient selection." *Id.* ¶ 26.  Then, the RMP further required Cephalon to monitor "[p]rescribing patterns … for the physicians in question," and "[i]f a problem [of off-label prescribing] persists, an *Actiq* Specialist will visit the physician/s to gather information and remind them of the appropriate prescribing of *Actiq*." *Id.*  These unique post-sale requirements on Cephalon distinguish this case from every other off-label marketing case filed to date.

## 2. Cephalon intentionally marketed Actiq for non-cancer pain to increase sales, conveying the message that "pain is pain."

Because the market for treating breakthrough cancer pain in opioid-tolerant patients was small, Cephalon prepared a campaign to ███████████████████████ in the general market for pain. Cephalon recognized that while ████████████████████████████ ██████████████████ the approved indication, it could push the drug on other physicians for other pain states, █████████████████████████ including ████████████ ██████████████████████████████[7] Proffer, ¶ 31, *See generally id.* at § II.C.1. Through the success of its off-label marketing plan, by ████████████, Cephalon ████████████████████████████████████████████ *Id.* ¶ 116.

Cephalon programmed its sales force that targeted physicians to operate under the mantra "pain is pain" despite ████████████████████████████████ *Id.* ¶ 46. *See generally id.* at § II.C. Cephalon pushed Actiq to treat headaches and short-term pain from injuries or surgery (*i.e.*, unrelated to terminal cancer). Cephalon pushed Actiq for use in ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ *Id.* ¶ 40.

Cephalon also directed various non-parties – paying physicians and vendors – to promote and tout Actiq for a host of non-cancer uses through continuing medical education ("CME") programs. *Id.* at § II.C.2(b). Cephalon also created "consultant's meetings," attended by Cephalon employees, and the consultant and CME programs included off-label discussions to

---



001936-11 451929 V3

drive Actiq sales, such as ███████████████████████████████████
███████████████████████████████████████████████████████████
███████████████ *Id.* ¶ 58. ███████████████████████████████
███████████████████████ *Id.* ¶ 56.

3.   **Cephalon buried an internal auditor's attempt to blow the whistle on Cephalon's intentional non-compliance with the Actiq risk management program.**

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████ *Id.* ¶ 85. ████████████████████████
███████████████████████████████████████████████████████████
██████████ *Id.* ¶¶ 85-86.

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
████████████████████████



001936-11 451929 V3



Ex. 159.[8]  After the auditor turned over his results, his superiors instructed him to: ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ ▮▮ ▮▮▮▮▮ ▮▮ ▮▮▮▮▮▮▮▮▮▮ ▮▮▮ ▮▮▮▮▮▮▮ ▮▮▮ ▮▮▮▮▮▮▮▮▮ ▮▮▮▮ ▮▮▮▮▮▮▮▮ ▮▮▮ ▮▮▮ ▮▮ ▮▮▮ ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ ▮▮▮ ▮▮▮ Proffer, ¶¶ 90-91.

Terminating the auditor,[9] Cephalon's damage control team then sprung into action, creatively working to avoid disclosing its massive off-label marketing success to the FDA.  *Id.* § II.D.2.  ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ ▮▮▮ ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ ▮▮ ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ ▮▮ ▮▮▮▮▮▮▮ ▮▮▮▮ ▮▮ ▮▮▮▮▮ ▮▮ ▮▮▮▮▮▮▮▮▮▮ ▮▮▮ ▮▮▮ ▮▮▮▮▮ ▮▮▮▮▮▮▮ ▮▮ ▮▮▮▮▮▮ ▮▮▮ ▮▮▮ ▮ ▮▮▮ ▮▮▮▮▮▮▮▮▮ *Id.* § II.D.2.  ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ ▮▮▮▮ ▮▮ ▮▮▮▮▮▮▮ ▮▮▮▮ ▮▮▮ ▮▮▮▮ *Id.* § II.D.2.

**4.**     **Cephalon launched Actiq** ▮▮▮▮▮ ▮▮▮ ▮▮▮▮▮ **of managed care and worked to ensure that the Class would pay for non-cancer Actiq prescriptions.**

Cephalon purposefully intended its scheme to operate ▮▮▮▮▮ ▮▮▮ ▮▮▮▮▮ of the Class to ensure that they paid for Actiq prescriptions.  According to Cephalon, ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ ▮▮▮▮▮▮▮ ▮▮▮ ▮▮▮▮ ▮▮ ▮▮▮▮▮▮ ▮▮ ▮▮▮▮▮ ▮▮▮ ▮▮▮▮▮▮ ▮▮ ▮▮▮▮▮▮▮ ▮▮▮▮▮ Proffer, § II.E.1.  Even as

---

[8] All exhibits are filed as attachments to the Declaration of Daniel J. Kurowski in Support of Plaintiffs' Motion for Class Certification, filed contemporaneously herewith.

[9] Cephalon terminated the auditor, who testified that he believes he was terminated because of his role in the RMP audit.  Proffer, ¶ 93.

Actiq neared patent expiration, Actiq continued ███████████████████ with

managed care being ███████████████████████████████████ *Id.* ¶ 118.

Cephalon's off-label marketing and refusal to implement the education campaign to stop

off-label sales caused Actiq sales to rise from $15 million in 2000 to $477 million in 2006.

Proffer, ¶ 127.  As with other members of the Class, Cephalon's unjust conduct negatively

impacted both Plaintiffs.  Proffer, § II.E.2.  And, it resulted in one of the largest whistleblower

settlements in U.S. history, culminating in a guilty plea agreement conceding that Cephalon

marketed Actiq off label.  Proffer, § II.F.  *Cf.* Proffer, § II.C (describing continuing non-cancer

promotional and sales representative training efforts throughout Class Period).

**B.      Dr. Deborah B. Leiderman Opines That the FDA Intended That Actiq Sales Remain Within the Cancer Population**

A Board Certified Neurologist and Fellow of the Academy of Neurology, Dr. Deborah B.

Leiderman is the former Director of Controlled Substances at the FDA's Center for Drug

Evaluation and Research ("CDER/FDA").  Leiderman Decl., ¶ 1.  Dr. Leiderman served as the

FDA lead on issues related to the safety and risks of controlled drug products, including opioid

analgesics, which include fentanyl products.  She also contributed to the development or reviews

of risk management plans for certain drugs while at the FDA.  *Id.* at ¶ 4.

As Dr. Leiderman explains, fentanyl, the active ingredient in Actiq, is a potent synthetic

opioid narcotic substance.  *Id.* at ¶ 8.  Prior to the 1990s, fentanyl was available in the United

States only as an injectable medication, and was used exclusively in the hospital setting for pre-

operative anesthesia and for severe post-operative pain.  *Id.*  Fentanyl is a potentially deadly

depressant of the brain's respiratory center.  *Id.*  It is approximately 100 times more potent than

morphine, 10 times stronger than hydrodomorphone (Dilaudid), 200 times more potent than

oxycodone and hydrocodone (the active drugs in OxyContin and Vicodin respectively), and 1000

times more potent than codeine. *Id.* at ¶ 9. Fentanyl, in the form of Actiq, exhibits rapid, although variable, onset of analgesic effect that generally lasts for one to four hours. *Id.* at ¶ 10. The potency and the relatively short duration of pharmacological action of fentanyl render it unsuitable for the treatment of chronic, persistent pain. *Id.*

Dr. Leiderman described that the FDA approved Actiq under 21 C.F.R. § 314.520 (Subpart H), a special approval reserved for drug products that meet unmet medical need but have significant safety risks, and that require limitations on access in order to be marketed safely. *Id.* at ¶ 13. The FDA thus explicitly approved Actiq only for breakthrough pain associated with cancer and under Subpart H with restricted distribution regulations, as the FDA "concluded that restrictions on distribution and use of Actiq are needed to assure safe use of the product." *Id.* at ¶ 14.

Dr. Leiderman opines that the FDA was using its full authority to limit the use of Actiq to the intended, cancer pain population, including extensive ongoing monitoring and reporting of prescribing patterns to the FDA – well beyond routine safety and reporting requirements. *Id.* at ¶ 16. The FDA would not have approved the drug Actiq for use at home by patients, except for the pressing need for relief of severe cancer pain not adequately controlled by other narcotic therapy. *Id.* at ¶ 21.

Thus, in an unusual move demonstrating the FDA's grave concern with the safety of Actiq, the FDA required Cephalon to monitor and report prescribing patterns by indication and specialty of prescriber as a component of the Risk Management Program. *Id.* at ¶ 22. *See generally* Risk Management Program (Ex. 4, 102). Actiq was the first analgesic opioid approved with a risk management plan and with restrictions to ensure safe use. Leiderman Decl., ¶ 13. This detailed level of reporting has been required for very few products – and only in the setting

001936-11 451929 V3

of a product approval for which the FDA has determined that use other than for the intended indication presents an unacceptable safety risk. *Id.* at ¶ 23.

## C.   Dr. Meredith Rosenthal Used Standard Methodologies and Data from Cephalon to Calculate Class Damages on a Class-Wide Basis

Dr. Meredith Rosenthal demonstrates that damages can be calculated on a class-wide basis using standard methods for calculating profitability, accounting data and information from Cephalon or publicly-available sources. Rosenthal Decl., ¶ 10. Professor Rosenthal is a Professor of Health Economics and Policy at the Harvard School of Public Health and an Academic Affiliate of Greylock McKinnon Associates ("GMA"), a consulting and litigation support firm. *Id.* at ¶ 1. Professor Rosenthal's principal research interests concern the economics of the healthcare industry, including pharmaceuticals. *Id.*

Professor Rosenthal opines that class-wide damages can be calculated for Plaintiffs' unjust enrichment claims in the form of the profits Cephalon achieved on the sale of Actiq for non-cancer uses, for each calendar year between 2002 through 2006. *Id.* at ¶ 16. Here, Professor Rosenthal started her analysis by calculating the total net profit. *Id.* at ¶¶ 11-13. After calculating net profit, she identified profit derived from sales to Class members by (1) excluding government discounts and a portion of profits attributable to governmental payors and (2) limiting the data to Class members by excluding a percentage of sales attributable to cash payers and Medicaid. *Id.* at ¶ 13. She further reduced the profits by eliminating cancer prescriptions. *Id.* at ¶ 14. Finally, she limited damages to the off-label prescriptions exceeding the FDA's 15% threshold for off-label prescriptions. *Id.* at ¶ 15.

Professor Rosenthal thus calculated damages for each year of the Class Period as follows:

**Actiq Profits Due to Off-Label Marketing**
**Attributable to the Class of Third-Party Payors**

| Year | Damages |
|------|---------|
| 2002 | ███████ |
| 2003 | ███████ |
| 2004 | ███████ |
| 2005 | ███████ |
| 2006 | ███████ |
| **Total** | ███████ |

*Id.* at ¶ 16.  While these figures are on a nationwide basis, profits can also be calculated on a

state-by-state basis as well.[10]

Thus, as more fully demonstrated in the Proffer and Expert Reports, evidence common to

the Class predominates.

**III.    PLAINTIFFS SATISFY THE REQUIREMENTS OF RULE 23**

Plaintiffs satisfy each of the Rule 23(a) and Rule 23(b)(3) requirements.  "Rule 23(a)

contains four threshold requirements, which every putative class must satisfy:

> (1) the class is so numerous that joinder of all members is
> impracticable; (2) there are questions of law or fact common to the
> class; (3) the claims or defenses of the representative parties are
> typical of the claims or defenses of the class; and (4) the
> representative parties will fairly and adequately protect the
> interests of the class."

*Sullivan v. DB Investments, Inc.*, 667 F.3d at 196 (quoting Fed. R. Civ. P. 23(a)).  "Upon finding

each of these prerequisites satisfied, a district court must then determine that the proposed class

---

[10] *See* Rosenthal Rep. at 5 n.29 ("If I am asked to do so by counsel, I can calculate damages by state using standard data and standard methods.").

001936-11 451929 V3

fits within one of the categories of class actions enumerated in Rule 23(b)." *Id.* "[C]ertification

pursuant to Rule 23(b)(3) seeking monetary compensation is permitted where (1) 'questions of

law or fact common to class members predominate over any questions affecting only individual

members,' and (2) 'a class action is superior to other available methods for fairly and efficiently

adjudicating the controversy.'" *Id.* (quoting Fed. R. Civ. P. 23(b)(3)).

While "an examination of the elements of plaintiffs' claim is sometimes necessary … to

determine whether the requirements of Rule 23 … are met" and "a court's rigorous certification

analysis may include a preliminary inquiry into the merits," "Rule 23 makes clear that a district

court has limited authority to examine the merits when conducting the certification inquiry." *Id.*

at 305-06 (citing *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305 (3d Cir. 2008); *Newton*

*v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154 (3d Cir. 2001)) (internal quotations

omitted).  As the Third Circuit explained in discussing the depth of a district court's inquiry in

deciding class certification:

> A court may inquire whether the elements asserted are capable of
> proof through common evidence, but lacks authority to adjudge the
> legal validity or soundness of the substantive elements of asserted
> claims.  Put another way, a district court may inquire into the
> merits of claims presented in order to determine whether the
> requirements of Rule 23 are met, but not in order to determine
> whether the individual elements of each claim are satisfied.

*Id.*  The record here confirms that each Rule 23 requirement has been met by a preponderance of

the evidence.

## A.   Plaintiffs Satisfy the Four Requirements of Rule 23(a)

### 1.   Plaintiffs satisfy Rule 23(a)(1)'s numerosity requirement because there are more than 1,000 TPP Class members.

First, each "class is so numerous that joinder of all members is impracticable."  Fed. R.

Civ. P. 23(a)(1).  While "[t]here is no precise number that will satisfy the numerosity

requirement … the district court may make a common sense determination in order to support the finding of numerosity." *Chakejian v. Equifax Info. Servs. LLC*, 256 F.R.D. 492, 497 (E.D. Pa. 2009) (citation and quotation omitted).  In general, a class exceeding forty geographically dispersed members will suffice. *See Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001); *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 477 (W.D. Pa. 1999).  Here, the evidence establishes that there were thousands of payments for Actiq by third-party payors. *See, e.g.*, Rosenthal Decl., ¶ 15 (reflecting ████████ in Actiq sales). *See also* Ex. 174 (referencing CEP_TPP_10299109, ███████████████████████████████████████████ ██████████████████████████████████).  Thus, Plaintiffs satisfy Rule 23(a)(1).

### 2. Unjust enrichment claims present common questions of law or fact as required by Rule 23(a)(2).

Second, Rule 23(a)(2) – also easily established here – requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).  However, not all questions of law and fact need to be common to the class as "the commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 184 (3d Cir. 2001) (quoting *In re Prudential Ins. Co. of Am. Sales Practices Litig. Agent Actions*, 148 F.3d 283, 310 (3d Cir. 1998)); NEWBERG ON CLASS ACTIONS § 18:5 (4th ed. 2002).  "Because the requirement may be satisfied by a single common issue, it is easily met." *Baby Neal for & by Kanter v. Casey*, 43 F.3d 48, 57 (3d Cir. 1994).

In the last year, multiple courts within the Third Circuit have certified unjust enrichment claims, finding the commonality requirement readily satisfied. *See O'Brien v. Brain Research Labs, LLC*, 2012 U.S. Dist. LEXIS 113809, at *15-16 (finding commonality satisfied since

- 16 -

"Plaintiff's cause of action for unjust enrichment and those of the class members present a

common question of law because:  (1) the laws of the fifty states are relatively uniform with

respect to the elements of proof of an unjust enrichment claim; and (2) those elements of proof

require little, if any, individualized inquiry"); *Carroll v. Stettler*, 2011 U.S. Dist. LEXIS 121171,

at *6, 17-18 (finding that "Plaintiffs satisfy the commonality requirement because the named

plaintiffs share at least one question of fact or law with the grievances of the prospective class …

common issues predominate in the plaintiffs' claim for unjust enrichment").

Consistent with each of these cases, Plaintiffs' and the Class members' claims arise from

the same course of events:  the Class' payments for Actiq for non-cancer patients, Cephalon's

purposeful marketing of Actiq for off-label uses and its refusal to halt the off-label prescriptions,

and Cephalon's retention of the payments for and profits from the off-label prescriptions.  *See,

e.g.*, Proffer, §§ II.C-E; Rosenthal Decl., ¶¶ 10-16.  *See also* Proffer, § II.E.2 (describing

Plaintiffs' purchases).  Moreover, every Class member makes the same legal arguments to prove

Defendant's liability for their economic injuries.  *See* Section III.B, *infra*.  None rely on

individual evidence, other than the fact of purchase, to prove Cephalon's liability.  Plaintiffs

satisfy Rule 23(a)(2).

**3.      Plaintiffs' claims are typical of those of the Class under Rule 23(a)(3) given
          Cephalon's deceptive conduct and refusal to halt off-label sales.**

Third, Rule 23(a)(3) requires that the claims of the class representatives be typical of

those of other class members.  "If the claims of the named plaintiffs and putative class members

involve the same conduct by the defendant, typicality is established regardless of factual

differences." *Gwiazdowski v. County of Chester*, 263 F.R.D. 178, 187 (E.D. Pa. 2009).  "The

overarching scheme is the linchpin … regardless of the product purchased, the market involved

or the price ultimately paid.  Furthermore, the various products purchased and the different

- 17 -

amount of damage sustained by individual plaintiffs' do not negate a finding of typicality, provided the cause of those injuries arises from a common wrong." *In re Flat Glass Antitrust Litig*, 191 F.R.D. at 480.

Here, Plaintiffs and the Class paid for Actiq manufactured, marketed, distributed and sold by Cephalon. *See* Proffer, § II.E.(2)-(3). Plaintiffs and the Class further paid for Actiq for the treatment of non-cancer pain. Thus Plaintiffs' claims arise from the same conduct giving rise to the claims of the Class, and the relief Plaintiffs seek is common to each. Accordingly, their claims are typical. *See In re OSB Antitrust Litig.*, 2007 U.S. Dist. LEXIS 56584, at *6 (E.D. Pa. Aug. 3, 2007) (finding typicality met and noting "[a]lthough damages may differ as to each class representative, all the representatives base their claims on the same legal theory as the class" *i.e.*, "that all members of the class suffered economic injury when they made direct purchases of OSB manufactured by Defendants," adding even "Defendants concede[d] [that] Plaintiffs have shown their claims to be typical of those of the proposed class").

> ### 4. ICWF and PTC will fairly and adequately protect the interests of the Classes pursuant to Rule 23(a)(4).

The final Rule 23(a) factor requires a plaintiff to show that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Adequacy of representation has two criteria: (1) that the proposed representative plaintiffs do not have conflicts of interest with the proposed class, and (2) that plaintiffs are represented by qualified and competent counsel. *Johnston*, 265 F.3d at 185.

First, there are no actual or potential conflicts between the Class' members, ICWF and/or PTC, each of whom paid for Actiq for non-cancer patients. Each Class member has the same interest in establishing Cephalon's liability because each named Plaintiff and each Class member paid for Actiq for non-cancer patients, unjustly enriching Cephalon given the company's

intentional marketing practices.  By pursuing this litigation, each Plaintiff will necessarily

advance the common interests of each Class member.

Second, as reflected in the attached resumes of their counsel, Plaintiffs are represented by

qualified counsel, experienced in pharmaceutical litigation.  *See* Exs. 9-11 (Firm Resumes of

Hagens Berman Sobol Shapiro LLP; Price, Waicukauski & Riley LLC; and Kessler Topaz

Meltzer & Check LLP.  This Court has observed first-hand their diligent and aggressive

prosecution of this matter, knowledge of the applicable law, and the investment of resources to

prosecute this complex matter.  *See* Fed. R. Civ. P. 23(g)(1)(B); *infra* at § III.C (applying these

factors).  *See generally* Docket.  Consequently, Plaintiffs meet the requirements of Rule 23(a)(4).

**B.      Rule 23(b)(3) is Satisfied Because Common Questions of Law or Fact Predominate
and a Class Action Remains Superior over Other Forms of Adjudication**

**1.      Common questions of law predominate because there are minimal actual
differences among each state's unjust enrichment law.**

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently

cohesive to warrant adjudication by representation."  *Amchem Prods. v. Windsor*, 521 U.S. 591,

623 (1997).  This inquiry "does not demand unanimity of common questions, it requires that

common questions outweigh individual questions."  *McCall v. Drive Fin. Servs., L.P.*, 236

F.R.D. 246, 254 (E.D. Pa. 2006) (citing *Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 185

(3d Cir. 2001)).  Given the very nature of unjust enrichment claims, "courts often certify unjust

enrichment claims because common questions predominate and are all easily resolved class

wide," as "common evidence will focus on the defendant's gain and not on the plaintiff's loss."

*In re Checking Account Overdraft Litig.*, 2012 U.S. Dist. LEXIS 113621, at *76 (S.D. Fla.

Aug. 10, 2012) (internal quotation omitted).

Because Pennsylvania is Cephalon's principal place of business, Plaintiffs request that the Court certify either the Nationwide Classes under Pennsylvania unjust enrichment law or two multi-state classes based on groupings of states with similar unjust enrichment laws.

> **a.     Common questions of law predominate for the Nationwide Class because only one state's law will need to be applied.**

> > **(1)     The law of the case directs that Pennsylvania law should apply to Plaintiffs' unjust enrichment claims.**

First, a choice of law analysis mandates application of Pennsylvania unjust enrichment law to the Nationwide Class.  In determining what substantive law applies, federal courts apply the choice of law rules of the forum state, *i.e.*, Pennsylvania.  *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941).  "In Pennsylvania, choice of law analysis first entails a determination of whether the laws of the competing states actually differ.  If not, no further analysis is necessary."  *Ratti v. Wheeling Pittsburgh Steel Corp.*, 2000 PA Super. 239, 758 A.2d 695, 702 (Pa. Super. 2000).  Here, this Court can apply Pennsylvania to the Nationwide Class, having correctly ruled that there is no conflict between the laws of the 50 states on unjust enrichment:

> The Court finds that there is no actual conflict between the laws concerning unjust enrichment claims, and the parties have not presented an issue concerning choice of law for these claims. It is established that there are minimal actual differences between the unjust enrichment laws in each of the 50 states.  Thus, the Court need not engage in a choice of law analysis for the unjust enrichment claims.

*In re Actiq,* 790 F. Supp. 2d at 322 (footnotes and citations omitted).[11]  Under the law-of-the-case doctrine, "once an issue has been decided, parties may not relitigate that issue in the same case."  *Waldorf v. Shuta*, 142 F.3d 601, 616 n.4 (3d Cir. 1998).  Notably, in reaching this decision, the

---

[11] The Court reaffirmed its decision in its entirety on Cephalon's motion for reconsideration. *See In re Actiq Sales & Marketing Practices Litig.,* 2012 U.S. Dist. LEXIS 81773, at *1 (E.D. Pa. June 13, 2012).

Court came to the same conclusion reached by other courts.  *See also In re Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. 46, 58 (D.N.J. 2009) ("While there are minor variations in the elements of unjust enrichment under the laws of the various states, those differences are not material and do not create an actual conflict."); *Powers v. Lycoming Engines*, 245 F.R.D. 226, 231 (E.D. Pa. 2007) ("Although there are numerous permutations of the elements of the [unjust enrichment] cause of action in the various states, there are few real differences.  In all states, the focus of an unjust enrichment claim is whether the defendant was unjustly enriched.  At the core of each state's law are two fundamental elements – the defendant received a benefit from the plaintiff and it would be inequitable for the defendant to retain that benefit without compensating the plaintiff.  The focus of the inquiry is the same in each state.  Application of another variation of the cause of action than that subscribed to by a state will not frustrate or infringe upon that state's interests.  In other words, regardless of which state's unjust enrichment elements are applied, the result is the same.  Thus, there is no real conflict surrounding the elements of the cause of action."), *vacated on other grounds*, 2009 U.S. App. LEXIS 6785 (3d Cir. 2009); *In re Pennsylvania Baycol Third-Party Payor Litig.*, 2005 Phila. Ct. Com. Pl. LEXIS 129, at *19-20 (Pa. C.P. 2005) ("*Baycol*") ("The law of unjust enrichment does vary from state to state.  A conflict of law exists for plaintiffs' national claim for unjust enrichment but the conflict is not relevant to this lawsuit.  All state laws commonly find unjust enrichment when a defendant wrongfully retains the money received from a sale when the defendant thereafter advises the consumer not to use the product because it may be unsafe.  Essentially, the law everywhere requires proof that the defendant has kept what a plaintiff paid for a product under circumstances in which retention  is inequitable.") (internal citations omitted).

- 21 -

> (2)  **Even if Cephalon improperly relitigated the choice of law issue, RESTATEMENT (SECOND) OF CONFLICTS § 145 unequivocally points to the application of Pennsylvania law.**

Despite the law-of-the-case, Cephalon may nevertheless attempt to argue that a conflict exists among the laws of the 50 states.  However, the presence of any purported material conflicts merely requires the Court to utilize the approach set forth in the RESTATEMENT (SECOND) OF CONFLICTS § 145, which unequivocally points to the application of Pennsylvania law.  *Baycol*, 2005 Phila. Ct. Com. Pl. LEXIS 129, at \*18-19 (certifying nationwide class of third-party payors under Pennsylvania unjust enrichment law) (citing *Troxel v. A.I. duPont Inst.*, 431 Pa. Super. 464, 468, 636 A.2d 1179, 1181 (1994)).  This standard analyzes "the extent to which one state rather than another has demonstrated by reason of its policies and their connection and relevance to the matter in dispute a priority of interest in the application of its rule of law."  *Id.*

The following factors may be considered in the analysis:  (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) domicile, residence, nationality, place of incorporation, and place of business of the parties; (4) and the place where the relationship between the parties is centered.  *Baycol*, 2005 Phila. Ct. Com. Pl. LEXIS 129, at \*18-19 (citing *Laconis v. Burlington County Bridge*, 400 Pa. Super. 483, 492, 583 A.2d 1218, 1222-23 (1990)).  Moreover, the weight of a particular state's contact must be measured on a qualitative rather than a quantitative scale.  *Cipolla v. Shaposka*, 439 Pa. 563, 566, 267 A.2d 854 (1970).

Here, Cephalon advanced its scheme resulting in its unjust enrichment right here in Pennsylvania, including: ██████████████████████████████████████████████████ ██████ Proffer, ¶¶ 32, 56-57, 67,114, 117-18; █████████████████████████ *id.* at ¶¶ 33.n59, 85-112; ███████████████████████████ *id.* at ¶¶ 98, 109; (d);

- 22 -



▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, *id.* at ¶¶ 113-120; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, *id.* at ¶¶ 35-36; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, *id.* at ¶¶ 85-93; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, *id.* at ¶¶ 94-112; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, *id.;* and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *id.* at ¶¶ 127-29.  Pennsylvania's contacts with the facts of this case unequivocally trump those of any other state.

Baycol, 2005 Phila. Ct. Com. Pl. LEXIS 129, is instructive here.  In *Baycol*, plaintiff third-party payors filed a class action in state court arising from the defendants' decision to cease distribution of a cholesterol-lowering drug known as Baycol, and defendants' announcement that patients should immediately cease any use of the drug.  *Id.* at *1.  Plaintiffs sought to recover payments made by third-party payors nationwide for Baycol as well as costs associated with transferring patients to a different drug.  *Id.*  Plaintiffs filed a motion for class certification for their warranty and unjust enrichment claims.  Presented with circumstances similar to those presented here, a Pennsylvania court applied Pennsylvania law nationwide against the defendant drug manufacturers and distributors, stating:

> Additionally, even if minor variations of law do exist it is neither inequitable nor improper under the facts of this case to apply Pennsylvania law to all claims.  Defendants maintain their principle places of business in Pennsylvania.  They directed and controlled their national sales strategies with regard to TPP's [third-party payors] from within Pennsylvania.  Their refund policy was designed or coordinated within Pennsylvania.  The Commonwealth of Pennsylvania has a strong interest in the conduct of the execution of contract rights and the business expectations in the uniformity of interpretation in commercial and insurance reimbursement contracts controlled from within the state.

001936-11 451929 V3

*Id.* at \*17.  Like in *Baycol,* the scheme to push Actiq for non-cancer pain was developed, refined and implemented from Pennsylvania.  Also, similar to the defendants in *Baycol,* Cephalon "directed and controlled national sales strategies with regard to TPP's [third-party payors] from within Pennsylvania."  Clearly, even if the law-of-the case did not apply here, Pennsylvania law controls.

> **(3)      Because nationwide application of Pennsylvania unjust enrichment law properly governs here, common questions of law predominate.**

Because Pennsylvania's unjust enrichment law should be applied here, common questions of law predominate.  "The elements of unjust enrichment are 'benefits conferred on defendant by plaintiff, appreciation of such benefits by defendant and acceptance and retention of such circumstances that it would be inequitable for defendant to retain the benefit without payment of value.'"  *Baycol*, 2005 Phila. Ct. Com. Pl. LEXIS 129, at \*21 (quoting *AmeriPro Search, Inc. v. Fleming Steel Co.*, 2001 Pa. Super. 325, 787 A.2d 988 (2001)) (citations omitted).  Based on the fact that just one state's law will apply, common questions of law will predominate as Plaintiffs will need to prove just one set of elements for their unjust enrichment claim.  Accordingly, Plaintiffs respectfully request certification of the Nationwide Class under Pennsylvania unjust enrichment law.

> **b.      Common questions of law predominate for the alternative classes.**

Alternatively, Plaintiffs request certification of two multi-state classes of payors that paid for Actiq in states with laws similar to the laws of Plaintiffs' states of payment.  *See Baycol,* 2005 Phila. Ct. Com. Pl. LEXIS 129, at \*17-18 ("If indeed the defense persists in it's [sic] contention that relevant differences [under unjust enrichment law] do exist, the Court is confident that the 'ingenuity of counsel' can craft specific subclasses which allow for the easy management of trial while preserving all claims for appellate review.").  Plaintiffs thus submit

- 24 -

detailed state law groupings analyses that demonstrate groupings of laws can be certified.[12/13]

Practically speaking, "'[t]here will never be 50 different substantive rules, or even fifteen or ten. States tend to copy their laws from each other, and many use identical or virtually identical rules. In practice, the court will seldom have to deal with more than three or four formulations.'"

---

[12] *See* Exs. 12-13 to the Kurowski Decl.

[13] Precedent for grouping according to similarities in state law exist in numerous class certification decisions. *See, e.g., In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 250 (D. Del. 2002) (certifying settlement class over objections that variations of state consumer fraud and antitrust laws defeat predominance where "these issues can be minimized by grouping state statutes and common law that share common elements of liability or common defenses, particularly where the lawsuits do not involve personal injuries"), *aff'd*, 391 F.3d 516 (3d Cir. 2004); *In re Telectronics Pacing Sys., Inc.*, 172 F.R.D. 271, 292 (S.D. Ohio 1997) (conducting Rule 23(b)(3) analysis and noting that "if the elements of the cause of action are the same and the legal standards on important/ meaningful/ significant/ pivotal issues are substantially similar[,] the state laws can be grouped for purposes of class certification") (internal quotation omitted); *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296 (1st Cir. 2000) (affirming district court's certification of warranty grouping of eight states and rejecting defendant's arguments that "idiosyncratic" differences among state law precluded certification because "[a]s long as a sufficient constellation of common issues binds class members together," state law variations "will not automatically foreclose class certification under Rule 23(b)(3)"); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022-23 (9th Cir. 1998) (explaining that "[v]ariations in state law do not necessarily preclude a 23(b)(3) action, but class counsel should be prepared to demonstrate the commonality of substantive law applicable to all class members," writing that any differences in breach of implied warranty and other consumer protection remedies "are not sufficiently anomalous to deny class certification" because any such "idiosyncratic differences between state consumer protection laws are not sufficiently substantive to predominate over the shared claims"); *In re Pharm. Indus. Average Wholesale Price Litig.* ("*In re AWP*"), 252 F.R.D. 83, 94 (certifying thirty-six state consumer fraud class of TPPs based on a groupings analysis and distinguishing from cases in which multi-state classes were not certified as follows: "Much of the time, courts have declined to certify multi-state class actions because plaintiffs' class counsel failed to do their homework.") (internal quotation omitted); *Southern States Police Benevolent Ass'n v. First Choice Armor & Equip., Inc.*, 241 F.R.D. 85, 90 (D. Mass. 2007) (certifying twenty-three state breach of warranty group over Defendant's objections that variations of state warranty law did not predominate "after reviewing the extensive analysis and comparative charts created by the plaintiffs"); *Allapattah Servs. v. Exxon Corp.*, 188 F.R.D. 667, 673 (S.D. Fla. 1999) ("A claim or defense can implicate common issues and be litigated collectively, despite the existence of state law variations, so long as the elements of the claim or defense are substantially similar and any differences fall into a limited number of predictable patterns which can be readily handled by special interrogatories or special verdict forms."); *In re Copley Pharm., Inc.*, 161 F.R.D. 456, 469 (D. Wyo. 1995) (denying defendant's motion to decertify class in multidistrict litigation involving warranty claims, explaining that "[i]f the law of a particular state appears to be idiosyncratic, the residents from that state can be excised from the class" and "[e]ven if such idiosyncrasies remove half the jurisdictions in the United States, which the Court believes is highly unlikely, the application of common issues concerning the other twenty-five states should conserve judicial and litigation resources for all involved").

*O'Keefe v. Mercedes-Benz USA, LLC*, 214 F.R.D. 266, 291 n.19 (E.D. Pa. 2003) (quoting Larry

Kramer, *Choice of Law in Complex Litigation*, 71 N.Y.U. L. Rev. 547, 583 (1996)).

As the Third Circuit has correctly recognized for over a decade, where multistate claims

apply in a class action, plaintiffs can overcome any "differences in state law … at trial by

grouping similar state laws together and applying them as a unit." *In re Prudential Ins. Co. Am.*

*Sales Practice Litig. Agent Actions*, 148 F.3d at 315. This rings true particularly where, like

here, (1) the "elements of these common law claims [were] substantially similar and any

differences fall into a limited number of predictable patterns" and (2) the plaintiffs "compiled 'a

series of charts setting forth comprehensive analyses of the various states' laws potentially

applicable to their common law claims'" in support of certification. *Id.* And, neither Rule 23

nor the Third Circuit requires exactitude in causes of action as Cephalon may suggest:

> Nothing in our case law or the language in Rule 23 commands that
> everyone in a class must allege precisely identical or 'uniform'
> causes of action, and statutory variations do not defeat
> predominance in the absence of other exceedingly common
> issues. … [W]here a defendant's singular conduct gives rise to one
> cause of action in one state, while providing for a different cause
> of action in another jurisdiction, the courts may group both claims
> in a single class action. This tactic in litigation advances the
> laudatory purposes of the class action device, preserv[ing] the
> resources of both the courts and the parties by permitting issues
> affecting all class members to be litigated in an efficient,
> expedited, and manageable fashion.

*Sullivan v. DB Invs., Inc.*, 667 F.3d at 302 (citation and quotation omitted). Further, "[t]he

existence of state law variations alone is not sufficient to preclude class certification." *Carroll v.*

*Stettler*, 2011 U.S. Dist. LEXIS 121171, at *14 n.2 (certifying unjust enrichment class and citing

Third Circuit appellate and district decisions).[14]

---

[14] *See, e.g, Overka v. American Airlines, Inc.*, 265 F.R.D. 14, 19 (D. Mass. 2010) ("Courts have noted that unjust enrichment claims in different states are substantially similar. … In the present case, having analyzed the laws of the thirty-four jurisdictions, the Court rules that they

Here, Plaintiff ICWF seeks certification of an Unjust Enrichment (Restatement) Class on behalf of all third-party payors that paid for Actiq for non-cancer patients in twelve jurisdictions: Arkansas, Colorado, Connecticut, the District of Columbia, Hawaii, Illinois, Indiana, Iowa, New Hampshire, New York, Oklahoma and West Virginia.  Likewise, Plaintiff PTC seeks certification of an Unjust Enrichment (Appreciation) Class on behalf of all third-party payors that paid for Actiq on behalf of non-cancer patients in twenty-one jurisdictions:  Alaska, California, Florida, Georgia, Kansas, Kentucky, Maine, Maryland, Massachusetts, Missouri, Nevada, New Mexico, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, Washington and Wisconsin.  Following the Third Circuit's direction, the states comprising these two sets of Unjust Enrichment Classes have been carefully selected as the

---

are substantially common and the differences between them are manageable."); *Keilholtz v. Lennox Hearth Prods.*, 268 F.R.D. 330, 341 (N.D. Cal. 2010) (concluding Common questions of law predominated regarding unjust enrichment claims and noting that while "[l]aws concerning unjust enrichment do vary from state to state," "the variations among some states' unjust enrichment laws are not material because they do not significantly alter the central issue or the manner of proof in this case.  Common to all class members and provable on a class-wide basis is whether Defendants unjustly profited from the sale of their fireplaces."); *In re Abbott Labs. Norvir Anti-Trust Litig.*, 2007 WL 1689899, at *10 (N.D. Cal. June 11, 2007) (finding unjust enrichment claims predominated and explaining that the "failure to certify the unjust enrichment claims could result in class members having to file thousands of individual suits in which the discovery and factual issues would be nearly identical," and adding that "sub-classes can be identified to group residents of various States with identical common law requirements [such that these] problems are manageable and, therefore, a class action is the superior method of resolving the unjust enrichment claims"); *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 697 n.40 (S.D. Fla. 2004) (certifying multi-state class under unjust enrichment law where "[c]ourts have recognized that state claims of unjust enrichment are 'universally recognized causes of action that are materially the same throughout the United States,'" and explaining that some states "expressly followed or cited with approval the Restatement [(First) of Restitution]'s definition of unjust enrichment," while other states "mirror those of the Restatement, only adding the additional element of 'realization,' 'appreciation,' or some kind of knowledge on the part of the Defendants of the conferral of the benefit by the Plaintiff" [citation omitted].  The court concluded that because the plaintiffs "have indicated that they will present common evidence establishing this additional 'appreciation' element, the absence of such a requirement under the Restatement (and the law of the states that follow it) presents no obstacle to class certification.").

result of intensive research into the law of unjust enrichment throughout the United States and take into account any potentially relevant differences in state law.[15]

First, states apply one of four similar definitions of unjust enrichment: (1) eighteen jurisdictions follow the RESTATEMENT (FIRST) OF RESTITUTION'S definition of unjust enrichment as their elements of a cause of action for unjust enrichment,[16] (2) an additional twenty-seven states also follow the RESTATEMENT'S definition of unjust enrichment but have the added element that the defendant "appreciate," realize or know about the conferral of a benefit by Plaintiffs as part of the elements for the cause of action,[17] (3) four states, Arizona, Delaware, Louisiana and North Dakota, require a "connection" between the impoverishment of a plaintiff and the enrichment of a defendant as part of the cause of action, and (4) two states, Texas and Wyoming, require that a plaintiff demonstrate circumstances that reasonably notified a defendant that the plaintiff would "expect payment" of the benefit conferred.  Of these four groupings, Plaintiffs are only seeking certification of the states from the first two.[18]  In addition, from within these two groupings, Plaintiffs have also excluded any states that may require privity between the party conferring the benefit and the party allegedly unjustly enriched,[19] as well as any states

---

[15] In offering this alternative argument, Plaintiffs do not concede that these differences are material.

[16] These states include:  Alabama, Arkansas, Connecticut, the District of Columbia, Hawaii, Illinois, Indiana, Iowa, Michigan, Mississippi, Montana, Nebraska, New Hampshire, New Jersey, New York, Oklahoma and West Virginia.

[17] These states include:  Alaska, California, Florida, Georgia, Idaho, Kansas, Kentucky, Maine, Maryland, Massachusetts, Minnesota, Missouri, Nevada, New Mexico, North Carolina, Ohio, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, Virginia, Washington and Wisconsin.

[18] Plaintiffs do not seek certification of "connection" states (Arizona, Delaware, Louisiana and North Dakota) or "expectation of payment" states (Texas and Wyoming) because neither ICWF nor PTC paid for Actiq in states within these groupings, not because they do not believe that these elements can be met.

[19] Plaintiffs have excluded states with "privity" requirements, namely Idaho, North Carolina, New Jersey and Ohio, because they did not pay for Actiq while in contractual privity to Cephalon.

requiring that a plaintiff show misconduct rising to the level of fraud in order to recover.[20]  *See* Exs. 12-13 to Kurowski Decl.

Each multi-state Unjust Enrichment Class takes into account any potential differences in the elements needed to maintain an unjust enrichment claim.  Because Plaintiffs have eliminated the few potential nuances that might serve to weigh against certification, common questions of law predominate, and certification of the two sets of multi-state Unjust Enrichment Classes is appropriate as an alternative to one nationwide class under Pennsylvania law.  To assist the Court, Table 1 visually depicts those states Plaintiffs seek to certify in the alternative as well as the excluded states and the reasons for exclusion.

---

[20] While Plaintiffs believe that Defendant's actions rise to the level of misconduct needed to assert a claim for unjust enrichment in these states, Plaintiffs do not seek certification for these states because of the possible differences in the law of these states regarding what is needed to prove "misconduct" with an unjust enrichment claim.  Indeed, Cephalon's misconduct has already been established.  *See* Ex. 1 (Guilty Plea Agreement).

**Table 1**



Thus, Plaintiffs have demonstrated that the law of multiple states can be grouped for purposes of class certification, ensuring common issues of unjust enrichment law predominate.

**2.    Given the ample common evidence of Cephalon's misconduct set forth in the Proffer of Facts, common questions of fact predominate.**

Common questions of fact also predominate pursuant to Fed. R. Civ. P. 23(b)(3), regardless of the class ultimately certified.  Again, the Fact Proffer and two expert reports demonstrate by a preponderance of evidence that Plaintiffs satisfy Rule 23(b)(3).

**a.    Common questions of fact predominate for the Nationwide Class.**

In the event that the Court determines that Pennsylvania law should be applied to Plaintiffs and the Nationwide Class, Plaintiffs can and will use common evidence to prove each of their claims under Pennsylvania law.

The analysis in *Baycol*, 2005 Phila. Ct. Com. Pl. LEXIS 129, is on point.  In granting Plaintiffs' motion for class certification of a nationwide class of third-party payors under Pennsylvania unjust enrichment law, the *Baycol* court found that:

> The application of this doctrine in this matter does not depend on the particular factual circumstances of the case at issue.  An unjust enrichment class requires answers to the following common questions of fact:  (1) did plaintiffs confer a benefit upon defendants, (2) did the defendants appreciate the benefit.  These questions must be answered in the affirmative since the plaintiffs' present a claim only to the extent that they paid defendants for Baycol which the company thereafter strongly urged consumers not to use.  An unjust enrichment claim further requires proof of (3) whether the defendant accepted and retained the benefits under the circumstances that would make it inequitable for the defendant to retain the benefit without payment for value.  The response to this remaining factual question will be uniform as to every class member.  Determination of the equitable claim of unjust enrichment will not require any individualized determination, all class members stand in precisely the same relation to defendant.  Either it would be inequitable for defendants to retain the payments made to them by TPPs while refunding the deductible or co-pay

- 31 -

> for the same purchase or it is acceptable.  No individualized issues
> are significantly involved in the unjust enrichment claim.

*Id.* at *21-22.  Accordingly, the court properly held that common issues of fact predominated.

Like in *Baycol*, Plaintiffs will submit common evidence from Defendant's own files and testimony from Defendant's witnesses to demonstrate that Plaintiffs conferred a benefit upon Cephalon, through the payment for Actiq for non-cancer patients, and Cephalon appreciated the benefit.  *See generally* Proffer, ¶¶ 122, 125, 127-29; *In re Actiq*, 790 F. Supp. 2d at 330 ("The record reflects that Plaintiffs, third-party payors, bestowed upon Defendant a monetary benefit in the form of the payments for Actiq for the members of Plaintiffs, and that Defendant has retained this benefit." ).  *See also Hayes v. Wal-Mart*, 281 F.R.D. at 214-15 (certifying unjust enrichment class in action involving the sale of service plans on products for which service is excluded, noting "the first element requiring the plaintiff to demonstrate the receipt of a benefit by the defendant is met through common proofs.  The Defendant received a benefit through the sale of Service Plans to the Plaintiff and other purported class members.").

Further, Plaintiffs will show, from Cephalon's documents, the circumstances that would make it inequitable for Cephalon to retain the benefit, *i.e.*, Cephalon's implementation of a wide-reaching scheme to push Actiq for non-cancer patients, its refusal to halt off-label sales, and to cause third-party payors to pay for those prescriptions.  *See generally* Proffer, §§ II.C-E.  *See also Hayes*, 281 F.R.D. at 215 (finding that the inquiry of whether retention of a benefit without payment would be unjust can be "met through common proofs because the Defendant's conduct in selling the Service Plans to customers without first informing customers that the Service Plan excludes as-is coverage is common to all members"); *Carroll,* 2011 U.S. Dist. LEXIS 121171, at *17 (noting that whether it would be inequitable to allow defendants to retain the benefit at issue "without payment or value" "does not require individualized inquiry into the equities of each

class member's case. The Court need only decide whether, as a matter of principle, it is unjust to

allow those who made money off of fraudulent transfers in a Ponzi scheme to retain that money

without payment or value.  That principle, once decided, would be equally applicable and

common to all members."). *See also In re Actiq,* 790 F. Supp. 2d at 330 ("[T]here remains a

question of law as to whether Defendant's conduct would make it inequitable for Defendant to

continue to retain this monetary benefit from its sales of Actiq, which was allegedly obtained due

to Defendant's unlawfully deceptive practices.").  The proof will be uniform as to every Class

member:  "Determination of the equitable claim of unjust enrichment will not require any

individualized determination, all class members stand in precisely the same relation to

defendant." *Baycol*, 2005 Phila. Ct. Com. Pl. LEXIS 129, at *21-22.

Furthermore, the Court should not be persuaded by Cephalon's anticipated citation to two

factually distinguishable non-binding decisions where the courts declined to certify classes in

cases involving off-label marketing allegations under Rule 23(b)(3):  *In re Zyprexa Prods. Liab.

Litig.*, 620 F.3d 121 (2d Cir. 2010),[21] and *In re Neurontin Mktg. & Sales Practices Litig.,* 257

F.R.D. 315 (D. Mass. 2009).[22]  However, *Zyprexa* and *Neurontin* simply do not apply to the facts

presented to this Court.

---

[21] In *Zyprexa*, plaintiffs' "claims were based on the plaintiffs' contention that Lilly made
false statements and omitted material information concerning the safety and efficacy of
Zyprexa," a drug originally approved for schizophrenia.  620 F.3d at 129.  After the district court
granted class certification under the RICO claims, Lilly successfully moved under Rule 23(f) to
appeal the certification order.  *Id.* at 130.  Before the Second Circuit, the "parties agree[d] that
the requirements of Rule 23(a) are satisfied, but dispute[d] whether common questions
'predominate.'"  *Id.* at 131 (footnote omitted).

[22] In *Neurontin,* the plaintiffs alleged that "defendants' off-label promotion scheme
constituted a pervasive fraud designed to saturate the medical community with false information
about Neurontin's efficacy for several highly profitable off-label indications" and "[a]s a result
of this fraud, consumers and TPPs purchased Neurontin for conditions for which there was no
credible scientific evidence of efficacy."  257 F.R.D. at 318.  The district court found the
Rule 23(a) factors satisfied, but like in *Zyprexa,* the district court concluded that common issues
would not predominate.  *Id.* at 317.

First, and most significantly, neither of the drugs Zyprexa nor Neurontin posed the serious addiction and overdose concerns that caused the FDA to only approve Actiq for cancer patients. Thus, the FDA did not condition the approval of Zyprexa or Neurontin on risk management plans that strictly defined the defendants' conduct or required the defendants to monitor prescriptions post-sale and take active steps to halt off-label prescriptions. While federal law prohibited Cephalon and the Zyprexa/Neurontin defendants from peddling their products for off-label uses, only Actiq was approved with a risk management program that required post-sale actions to stop off-label prescriptions by Cephalon. Thus, under the Actiq RMP, Plaintiffs present common evidence that Cephalon had an affirmative duty to ensure that Actiq prescriptions remained limited to the intended patient population but more importantly that Cephalon intervene to stop off-label and contra-indicated prescribing. Indeed, Section 9.0 of the Actiq RMP directed Cephalon to intervene when off-label usage came to the company's attention both on an individual prescriber level as well as for groups of prescribers. *See* Proffer, ¶¶ 25, 87. Common evidence further establishes that Cephalon refused to intervene, even after its internal auditor waived a red flag of caution. Proffer, § II.D (discussing Brennan audit and Cephalon's risk management failures).

Second, both *Zyprexa* and *Neurontin* involved allegations that the defendant drug companies misrepresented that the drugs were effective for off-label uses when they were not effective for such uses. *Zyprexa*, 620 F.3d at 129; *Neurontin*, 257 F.R.D. at 318. By contrast, Plaintiffs have never alleged that Actiq was ineffective. Instead, Plaintiffs acknowledge the incredible power of Actiq to kill pain, but present common evidence that the many restrictions implemented were designed to limit the use of Actiq to a small group of patients who needed it

- 34 -

most and to whom the risks of overdose and addiction were not particularly relevant. Proffer, ¶ 17.

Additionally, both cases are procedurally distinguishable in that neither *Zyprexa* nor *Neurontin* reached their decisions analyzing unjust enrichment law.[23] Instead, both courts focused on RICO's causation requirement. However, given the differing elements of the causes of action, that analysis cannot be said to apply here. *Compare Zyprexa*, 620 F.3d at 131, 133 ("In order to recover damages under RICO, however, a plaintiff must show (1) a substantive RICO violation § 1962; (2) injury to the plaintiff's business or property, and (3) that such injury was by reason of the substantive RICO violation … while reliance may not be an element of the cause of action, there is no question that in this case the plaintiffs allege [an injury that is caused by physicians relying on Lilly's misrepresentations and prescribing Zyprexa accordingly], and must prove, third-party reliance as part of their chain of causation") (internal quotation omitted) *with In re Actiq*, 790 F. Supp. 2d at 329 ("[A] showing of unjust enrichment requires a plaintiff to prove that it: (1) conferred a benefit on the defendant; (2) such benefit was known and was retained or accepted by the defendant; and (3) it would be inequitable to allow the defendant to retain such benefit."). Given the significant differences in the cases presented, this Court should decline to find either *Zyprexa* or *Neurontin* persuasive.

Accordingly, because Plaintiffs have demonstrated by a preponderance of the evidence that common questions of fact predominate, Plaintiffs respectfully request that this Court certify the Nationwide Class under Pennsylvania unjust enrichment law.

---

[23] In certifying the RICO claim, the district court in *Zyprexa* referenced unjust enrichment only once, writing "the unjust enrichment cause of action has been rejected," since "[u]njust enrichment is not available under civil RICO." *In re Zyprexa Prods. Liab. Litig.*, 253 F.R.D. 69, 161 (E.D.N.Y. 2008) (citing 18 U.S.C. § 1964(c) and the language "damages he sustains").

####        b.        Common questions of fact predominate for the Alternative Classes.

Common questions of fact predominate with respect to proof of the elements of Plaintiffs' unjust enrichment claims under each of the state laws in the multi-state classes. Plaintiffs' unjust enrichment claims arise from the same core conduct by Cephalon, and are subject to the same common proof.[24] The focus of the unjust enrichment claim is the benefit conferred on Cephalon rather than any individual loss to an individual plaintiff.[25]

Here, Plaintiffs have limited the Alternative Unjust Enrichment Classes to those third-party payors that paid for Actiq for non-cancer patients, thereby conferring a benefit on Cephalon. The only question that the trier of fact will need to consider is whether it would be unjust to allow Cephalon to retain the benefits and, with respect to those Class members in the Unjust Enrichment (Appreciation) Classes, whether Cephalon realized or appreciated the conferral of the benefit by Plaintiffs. Those determinations require consideration of whether common evidence can be used to prove their claims. As Plaintiffs demonstrate in the Proffer, such determinations can and will be shown with using common evidence.

---

[24] *See Dal Ponte v. American Mortg. Express Corp.*, 2006 U.S. Dist. LEXIS 57675, at *25 (D.N.H. Aug. 17, 2006) ("[G]iven the allegation that [Defendant] engaged in an uniform pattern of improper conduct toward all proposed class members, common issues will predominate the proof of [unjust enrichment] claims as well."); *Slapikas v. First Am. Title Ins. Co.*, 250 F.R.D. 232, 248 (W.D. Pa. 2008) (unjust enrichment claim is "appropriate for class treatment" where defendant "followed the same standard procedures … in exactly the same way for each putative class member").

[25] *See, e.g., Hayes v. Wal-Mart*, 281 F.R.D. at 206, 215 (granting class certification of unjust enrichment claims arising out of the marketing and sale of "Sam's Club Service agreements for as-is products without disclosing to the purchaser that as-is products were expressly excluded from coverage," "since the Plaintiff can establish through common proofs that it would be unjust for the Defendant to retain the purchase price of the Service Plans on as-is products.").

These determinations focus on the conduct of Cephalon, and therefore, are common to all Class members and provable on a class-wide basis.  Because the Plaintiffs' unjust enrichment claims are focused primarily on Cephalon's uniform conduct in concealing information and failing to act to avoid inappropriate prescriptions, common fact issues predominate over any individualized issues.[26]  As succinctly stated in *Baycol*: "Either it would be inequitable for defendants to retain the payments made to them by TPPs … or it is acceptable.  No individualized issues are significantly involved in the unjust enrichment claim."  *Baycol*, 2005 Phila. Ct. Com. Pl. LEXIS 129, at *22.

Plaintiffs' unjust enrichment claims are focused on Cephalon's unlawfully deceptive practices and failure to act to prevent non-cancer prescriptions when Cephalon had the obligation to act.  Therefore, common issues predominate over individual issues, and the unjust enrichment claim is well-suited to class treatment.

### c.    Damages can be calculated – and have been calculated – on a class-wide basis.

Plaintiffs need only establish at this stage that unjust enrichment damages can be calculated on a class-wide basis using common evidence.  Here, using common evidence, Professor Rosenthal has demonstrated not only that methods are available to calculate class-wide unjust enrichment damages but has in fact calculated damages for the Nationwide Class.  Rosenthal Decl., ¶ 10.  *See supra* at § II.C.  In doing so, Professor Rosenthal demonstrates how class-wide damages are "capable of proof at trial through evidence that is common to the class rather than individual to its members."  *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311-312 (3d Cir. 2008).

---

[26] *See, e.g., Miletak v. Allstate Ins. Co.*, 2010 U.S. Dist. LEXIS 26913, at *1 (N.D. Cal. Mar. 5, 2010) (certifying class action including unjust enrichment claim where plaintiffs alleged a uniform harm).

Nevertheless, Cephalon may argue that individual damages calculations may be needed and that this would preclude class certification.  Yet, it is well-established in this Circuit that the potential that damages may need to be ascertained on an individual basis will not defeat class certification.  *See, e.g., Carroll*, 2011 U.S. Dist. LEXIS 121171, at *17-18 (certifying unjust enrichment class and citing *In re Chiang*, 385 F.3d 256, 273 (3d Cir. 2004), in ruling "[t]he only individualized consideration on the unjust enrichment claim would be as to … each person's entitled recovery," as "the Third Circuit in *Chiang* specified that the necessity of calculation of damages on an individualized basis does not preclude class certification") (internal citation omitted).  Thus, given that class-wide damages are measureable, class certification is appropriate.

### 3.    Plaintiffs submit a proposed trial plan demonstrating common questions of fact and law predominate and that a class action is manageable.

While not required by Rule 23 itself, "[a]n increasing number of courts require a party requesting class certification to present a 'trial plan' that describes the issues likely to be presented at trial and tests whether they are susceptible of class-wide proof." Fed. R. Civ. P. 23 advisory committee note (2003 amendments).  Because a trial plan will likely aid this Court in reaching the conclusion that a single trial can be efficiently and manageably conducted on the unjust enrichment claim, and that common questions of law and fact predominate, Plaintiffs have prepared and submit a proposed trial plan.  *See* Plaintiffs' Proposed Trial Plan For Unjust Enrichment Claims, Ex. 191.

Generally, the proposed trial plan provides an overview, based on the current state of discovery, of what Plaintiffs' case in chief will look like and the common evidence that Plaintiffs anticipate offering at trial.  *Id.*  Additionally, it provides Plaintiffs' current analysis on addressing judgment and post-judgment issues, including distribution of damages to each Plaintiff and other

- 38 -

Class members. *Id.* In certifying a settlement class, the court in *O'Brien,* recognized that unjust

enrichment claims are manageable at trial, given the similarity of unjust enrichment law:

> [A]s discussed earlier as to the commonality and typicality
> requirements of Fed. R. Civ. P. 23(a), the Court finds that, at least
> as to Plaintiff's unjust enrichment claim, issues common to the
> class predominate over individual questions. Because of the
> relative uniformity of the laws of the fifty states as to a claim for
> unjust enrichment, see Mercedes-Benz, 257 F.R.D. at 72, and the
> lack of need for individualized proof for such a claim, the concerns
> of trial manageability underlying the predominance requirement
> would not be present, even if certification were sought for
> purposes of trial.

*O'Brien*, 2012 U.S. Dist. LEXIS 113809, at *24-25.

### 4.   A class action is a superior method for fairly and efficiently adjudicating this controversy.

Next, certification of a class action here "is superior to other available methods for fairly

and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "Under the superiority

requirement, the court asks whether a class action, rather than individual litigation, is the best

method for achieving a fair and efficient adjudication." *Carroll,* 2011 U.S. Dist. LEXIS 121171,

at *18. Assessing superiority requires a court "to balance, in terms of fairness and efficiency, the

merits of a class action against those of 'alternative available methods' of adjudication."

*Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 632 (3d Cir. 1996). The Supreme Court

explained in *Amchem* that, similar to the predominance requirement, the requirement of

superiority ensures that resolution by class action will "'achieve economies of time, effort, and

expense, and promote ... uniformity of decision without sacrificing procedural fairness or

bringing about other undesirable results.'" *Amchem*, 521 U.S. at 615 (quoting Advisory

Committee's Note on Fed. R. Civ. P. 23).

Here, the *Amchem* goals of both fairness and efficiency lead this Court to class

certification. In the absence of a class action, numerous individual Class members would be

001936-11 451929 V3

forced to file suit individually, and because of the numerous common issues in each case, judicial resources would be wasted and all parties exposed to unfair inconsistencies. Indeed, "[t]o litigate the individual claims of even a fraction of the potential class members would place a heavy burden on the judicial system and require unnecessary duplication of effort by all parties." *In re Insurance Brokerage Antitrust Litig.*, 282 F.R.D. 92, 109 (D.N.J. 2012). And, given the common evidence that would be marshaled against Cephalon in individual litigation, "the balance may weigh heavily in favor of the class action." *Id.* (internal citations and quotations omitted). After all, Cephalon's unjust enrichment "liability is a common issue to the plaintiffs and the class members." *Carroll*, 2011 U.S. Dist. LEXIS 121171, at *19. Plaintiffs satisfy Rule 23(b)(3).

**C.     Plaintiffs' Counsel are Adequate Class Counsel under Rule 23(g)**

Finally, Rule 23(g) mandates that "a court that certifies a class must appoint class counsel." Fed. R. Civ. P. 23(g)(1). In appointing class counsel, this Court "must consider" four factors: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv). Moreover, the Court may also "consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B).

Here, Plaintiffs' attorneys have and will continue to "fairly and adequately represent the interests of the class," Fed. R. Civ. P. 23(g)(4), having performed substantial work in litigating against Cephalon. Collectively, they have invested thousands of hours prosecuting claims on behalf of the Class members, attending, defending and propounding depositions, defeating Defendant's motion to dismiss, motions for summary judgment (and reconsideration) and

- 40 -

aggressively pursuing discovery.  As the firms' resumes detail, Plaintiffs' interim class counsel possess extensive experience in prosecuting complex, multi-state litigation.  *See* Ex. 9-11. Further, Plaintiffs' interim class counsel are intimately familiar with the applicable law asserted on behalf of the Class members.  And, as evidenced by the fact that they have already devoted substantial time and effort to the prosecution of this proceeding, it is manifest that Plaintiffs' interim class counsel will continue to devote the necessary resources to representing the Classes following appointment as Class Counsel.  Because Plaintiffs' interim class counsel will continue to fairly and adequately represent Class members' interests, Plaintiffs request appointment of their counsel as Class Counsel pursuant to Fed. R. Civ. P. 23(g).

## IV.    CONCLUSION

Plaintiffs respectfully request that the Court certify the Nationwide Class, Alternative Classes, or single state classes under Pennsylvania and Indiana law.  Plaintiffs further request that the Court appoint Indiana Carpenters Welfare Fund and the Pennsylvania Turnpike Commission as class representatives, appoint Steve W. Berman of Hagens Berman Sobol Shapiro LLP (Chair of Lead Counsel Committee), William Riley of Price Waicukauski & Riley LLC (Lead Counsel Committee Member), and Joseph Meltzer of Kessler Topaz Meltzer & Check LLP (Lead Counsel Committee Member) as counsel for the Classes and grant Plaintiffs all such other relief as the Court deems necessary and appropriate.

001936-11  451929 V3

Dated: October 26, 2012

Respectfully Submitted,

By: /s/ Elizabeth A. Fegan
Elizabeth A. Fegan, Esq.
Daniel J. Kurowski, Esq.
HAGENS BERMAN SOBOL SHAPIRO LLP
1144 W. Lake St., Suite 400
Oak Park, IL 60301
(708) 628-4960
(708) 628-4950 (fax)
E-mail: beth@hbsslaw.com
E-mail: dank@hbsslaw.com

Steve W. Berman, Esq.
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 8th Ave., Suite 3300
Seattle, WA 98101
(206) 623-7292
(206) 623-0594 (fax)
E-mail: steve@hbsslaw.com

*Chair of the Lead Counsel Committee*

Joseph H. Meltzer, Esq.
Terence S. Ziegler, Esq.
Casandra A. Murphy, Esq.
KESSLER TOPAZ MELTZER & CHECK, LLP
280 King Of Prussia Road
Radnor, PA 19087
(610) 667-7706
E-mail: jmeltzer@ktmc.com
E-mail: tziegler@ktmc.com
E-mail: cmurphy@ktmc.com

William N. Riley, Esq.
Joseph N. Williams, Esq.
Brad Catlin, Esq.
PRICE WAICUKAUSKI & RILEY
301 Massachusetts Avenue
Indianapolis, IN 46204
(317) 633-8787
E-mail: wriley@price-law.com
E-mail: jwilliams@price-law.com
E-mail: bcatlin@price-law.com

*Members of Lead Counsel Committee*

001936-11 451929 V3

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on October 26, 2012, a true and correct redacted copy of the foregoing MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION was filed and served via CM/ECF on all counsel of record, with an unredacted copy filed under seal.

By: /s/ Elizabeth A. Fegan

001936-11 451929 V3